## Case No. 4,300.

### The EDWIN.

[1 Spr. 477;[1] 22 Law Rep. 198.]

District Court, D. Massachusetts. May, 1859.[2]

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court in Case No. 4,301. Decree of the circuit court affirmed by supreme court in 24 How. (65 U. S.) 386.]

Milton Andros, for libellants.
F. C. Loring, for claimant.

SPRAGUE, District Judge. It is contended by the counsel for the claimant: first, that the bill of lading has no validity, as it was signed after the disaster; second, that the libellants cannot sue upon the original contract, because that was merged in the bill of lading; third, that no lien ever existed upon the vessel; and fourth, that there was no liability, if the steamer was fit and suitable.

The first position is sustained. The master could not, after the loss had occurred, create a liability by signing the bill of lading. The rights of the parties had been previously fixed, and the bill of lading was wholly inoperative.

The second objection cannot be sustained. The claimant himself having repudiated the bill of lading, and successfully denied that it has any validity, cannot at the same time set it up, as an instrument of sufficient efficacy to merge or supersede the prior contract.

The third objection is that which has been most relied upon, and requires the greatest consideration.

The master, acting within the scope of his authority, made a contract of affreightment for the transportation of a cargo of cotton from Mobile to Boston. By the usage which was imported into this contract, and made a part of it, the master was to receive the cotton at the mill, which, it is verbally agreed, was on a wharf, and so situated that the cotton could be taken therefrom on board of a lighter. Pursuant to this contract, the master procured such lighter or boat as he saw fit, and received the hundred bales of cotton on board thereof, and, by his agent, gave a receipt therefor to the libellants, and it was conveyed, under the master's direction and authority, a distance of some miles, to the ship; but while alongside, and before the cotton had been taken on board, the boiler exploded, and the damage occurred. Now, it is insisted in behalf of the claimant, that inasmuch as the cotton was never actually on board of the ship, no lien upon her ever existed, and the opinions of the supreme court in The Freeman, 18 How. [59 U. S.] 188, and The Yankee Blade [Vanderwater v. Mills] 19 How. [60 U. S.] 90, are cited in support of this position. And it must be admitted that it is covered by the language used arguendo, in the opinions of the court in those cases. In the first, it is said: "Under the maritime law of the United States, the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment: but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it." And in the second, it is said: "If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the non-delivery, in good order, of goods never received on board; consequently, if the master or owner refuses to perform his contract, or for any other reason the ship does not receive cargo and depart on her voyage according to contract, the charterer has no privilege or maritime lien on the ship, for such breach of the contract by the owners, but must resort to his personal action for damages, as in other cases."

These, however, are only dicta, not decisions, the cases not calling for them. The first was where the master had been induced by fraud to sign a bill of lading for goods never shipped, and never intended to be put on board. And it was held that the master had no authority to sign the bill of lading, and that neither the vessel nor the general owner was bound thereby. The case of The Yankee Blade was only a contract in the nature of a partnership, as the court viewed it, by which an owner of one steamer agreed with the owner of another steamer, that each should put his boat on a certain line of travel, to make connecting links for the transportation of passengers. The remarks of the court, therefore, which have been cited, although entitled to great deference, are not of binding authority.

The language of the court is general. The cases did not require any careful consideration of limitations or conditions, or of explanations of what should be deemed the lading of goods on board, or equivalent thereto, and looking at the whole scope of their observations, it is not to be inferred that they would have applied the language which has been quoted, to a case like the present. In these opinions, stress is laid upon the necessity of reciprocity between the

merchandize and the ship. In [Vanderwater v. Mills] 19 How. [60 U. S.] 90, it is said: "The obligation is mutual and reciprocal. The merchandize is bound or hypothecated to the vessel for freight and charges, (unless released by the covenants of the charter party,) and the vessel to the cargo."

I cannot but think that the language of the court was intended to apply to contracts purely executory, and not to those which had been executed in part. Here the merchandize had been delivered to the master, and by him conveyed by water the distance of several miles, in execution of his contract. And he certainly could have held it, even as against the owner, until paid what he had a right to demand; in other words, he had a lien thereon.

The merchandize, then, was holden to the owner of the ship, which is all that is meant by saying that it is bound to the ship; and why then, was the ship not bound to the owners of the goods? The latter being held, reciprocity requires that the former also should be bound. Such a taking on board and transportation by the lighter is, in legal contemplation, equivalent to taking on board of the ship. The contract of affreightment was for the employment of the ship; and the use of the boat was merely subsidiary, and in execution of that contract. Suppose a master taking his cargo at the wharf or shore, uses the ship's boats to transport it to her, while lying in the roads, would not the possession of the goods in the boats be the same, in effect, as taking them on board of the ship? and can it make any difference, whether the boats so used have been purchased, or only hired for a term of time, as for a year, or a voyage, or for the occasion? It is the substitute for the ship. Whether a vessel may be subject to a tacit hypothecation for a breach of a contract of affreightment, where the merchandize has not been delivered to the carrier, is a question which deserves careful consideration, before it is answered in the negative.

In The Flash [Case No. 4,857], Judge Betts held, that such a lien might exist; but subsequently, in July, 1857, according to a newspaper report, he made a contrary decision, not because he had changed his own views, but in submission to the opinions in 18 How. [59 U. S.] and 19 How. [60 U. S.]. These cases, however, as we have already seen, decide no such question. The cases of Morewood v. Pollok, 1 El. & Bl. 743, and Salmon Falls Manuf'g Co. v. The Tangier [Case No. 12,265], have been cited to show that goods in a lighter, or on a wharf, although in the custody of the carrier, are not deemed to be on board of the ship. The question there decided arose under the statute of 26 Geo. III. c. 86, and the act of congress of March 3, 1851 (9 Stat. 635), exempting the carrier from liability for goods taken on board of his vessel, if burnt by fire occurring in, or on board of, the vessel; and the decisions were, that the court would not extend the exemption beyond the language of the statutes. It was merely the construction of a positive enactment, and cannot aid us in determining what should be the rule of liability deduced from the principles of maritime law. The exemption created by these statutes may well be said to be stricti juris, and such was, in effect, the decision of the court in refusing to extend it beyond the import of the words used by the legislature. I am aware that it has of late been repeatedly said by high authority (see [Vanderwater v. Mills] 19 How. [60 U. S.] 89) that liens created by the common maritime law are stricti juris; but I have seen very little explanation of the meaning of that phrase. Where a right is created by statute, it is not to be extended beyond a fair construction of the language of the positive enactment. But where it is given by the common law, it is coextensive with the reason and principle upon which it rests, and is not to be restricted to the precise facts of the cases in which it happens to have been heretofore presented, nor even to the phraseology which the court may have used in upholding the right in particular cases. A court does not create the right, and their attention is drawn only to the facts of the case in which they assert it, and to these their language should properly be referred. A statute right of exemption may be said to be stricti juris, and not to be extended by analogy to other cases, although we might suppose that it would have been reasonable for the legislature to have embraced them. But to apply the rule by which we construe a statute to judicial decisions of a common law right which rests upon reason and justice, or even to the language of the court in giving their opinion upon special circumstances, would be to deprive the common law, whether of the land or sea, of the glory of being a code of principles capable of such expansion and adaptation as to comprehend and govern the infinite variety of novel facts and circumstances growing out of the advance of civilization, and new branches and complications of business.

Pardessus, 3 Droit Com. 597, is the authority cited for the proposition, that maritime liens are of strict right. 19 How. [60 U. S.] 89. But he is there reasoning upon the Code de Commerce. Having stated, that by article 191, a lien is given on ships for the premium of insurance on ships, he raises the question, whether it is to be inferred by analogy, that there is a lien on goods for the premium of insurance on goods. And after saying that, from the silence of the legislature as to the latter, it may be inferred that it did not intend to embrace them, he goes on argumentatively to give other reasons, why such privilege does not extend to goods, and says that liens are stricti juris, that they are exceptions from the general rule of equality of

right in creditors, and are not to be extended, by analogy, from one case to another. All this is fairly to be taken to have reference to the liens upon which he has been commenting, which were created by positive enactment. The reasoning of Pardessus seems to have no application to privileges given by the common maritime law. His language shows that he is speaking of the written, and not of the unwritten law. He says: "An exception ought to be expressly stated, and to be confined to its terms; it does not extend, by logical consequence, from one case to another." But he is here only stating the argument against the lien for premium of insurance on goods. He subsequently states the argument on the other side, to which, in conclusion, he seems to give the preference.

The first time, as far as I recollect, that this citation from Pardessus is to be found in our reports, is in The Kearsarge [Case No. 7,633]. But there the subject-matter was a lien created by a statute of the state of Maine. It rested wholly upon positive enactments.

The case of The Tangier is a direct authority for the proposition, that a vessel may be subject to a lien for damage to goods, when not on board of her. There the merchandize had been transported to the port of destination, unlivered, and placed upon the wharf. But being still in the custody of the carrier, the vessel was held responsible for its loss. This is somewhat stronger than if the goods had been destroyed in being transported in the lighter from the ship to the shore; and, if in such case the vessel is subject to the hypothecation, why not, where the goods were destroyed in being transported in a lighter to the ship? In both, they are in the custody of the carrier, who is responsible for, and actually conveying them, in performance of his contract. Why should the same circumstances carry with them a liability, when occurring at one end of the voyage, and not when arising at the other?

The fourth ground of defence is that, if the steamboat was suitable for the purpose of conveying this cotton, there is no liability on the part of the carrier. This cannot be sustained. The carrier is not exempted from liability, merely because the boat or ship which he employs is seaworthy; that is, fit and suitable for the voyage. It is not contended that the explosion, in this case, was a peril of the sea, or of navigation, within the meaning of those terms, as used in bills of lading and other maritime contracts.

Decree for the libellants for $7,000 and costs.