## PROPELLER MOHAWK.

1. Where insurers, to whom the owners have adandoned, take possession, at an intermediate place or port, of goods damaged during a voyage by the fault of the carrier, and there sell them, they cannot hold the carrier liable on his engagement to deliver at the end of the voyage in good order and condition.
2. Facts stated which amount to such action on the part of the insurers.
3. Insurers, so accepting at the intermediate port, are liable for freight *pro rata itineris* on the goods accepted.
4. The explosion of a boiler on a steam vessel is not a "peril of navigation" within the term as used in the exception in bills of lading.

5. The court expresses its satisfaction that it could, in accordance with principles of law, decide against a party who had bought, and was prosecuting a claim, that the original party was not himself willing to prosecute; it characterizes such a purchaser suing as "a volunteer in a speculation."

APPEAL from the Circuit Court for the Northern District of Illinois, the case being thus:

On the 31st of October, 1860, two parties, owners of it, shipped on board the propeller Mohawk, the vessel being then at Chicago, and as was admitted in a stipulation of record, "in good and seaworthy condition," two consignments of wheat, amounting to 20,200 bushels, to be delivered at Buffalo in good order and condition, dangers of navigation excepted, upon payment of freight and charges. The property was insured by an insurance company at the last-named place for $20,000. The propeller proceeded on her voyage, and after the same had been more than half completed, grounded on the 7th of November on the St. Clair Flats, near Detroit. In the effort to get her off she became disabled by the bursting of her boiler, and afterwards sunk, and was compelled to suspend her voyage for a few days to make necessary repairs.

All the wheat but 1100 bushels got wet and was damaged by the sinking of the propeller. Upon information then given to the consignee and insurers at Buffalo, the agent of the owners of the wheat immediately abandoned it to the underwriters as for a total loss, and the latter then accepted the abandonment and paid the loss to the owners as for a total loss.

On the 11th of November, the underwriters ordered their agent at Detroit to take possession of the damaged wheat, and to sell it as it lay in the vessel at the flats, and the agent thereupon did sell the damaged portion of it to one Phelps, for $1200, and took his note therefor, at 30 days. A delivery into lighters to the purchaser began on the same day. The next day (the 12th) the agent reported the sale, and on the 13th received a telegram from his company acknowledging the advices, and approving thereof. After the sale had been

thus made, the company hearing that the master intended to claim freight, directed the agent to have nothing to do with the grain, unless the owners of the vessel would relinquish all claim for freight. It was arranged, however, between the agent and the master, that as the sale was a good one, it should stand, and that the freight should be left for after consideration. The whole of the damaged portion of the cargo, amounting to 19,100 bushels, was delivered by the propeller to the purchaser, Phelps, and the residue, 1100 bushels, was retained on board, and carried by the propeller to Buffalo, where it arrived safely. On *that residue* the insurance company tendered full freight and all other lawful charges, including a sum to cover general average charges; but refused to pay either *pro rata* or full freight on the wheat delivered on the flats. The master accordingly refused to deliver the 1100 bushels; the value of it being less than the freight on it and the *pro rata* freight on the larger quantity sold; and he asserting that he was entitled to freight on the entire shipment, either in full, or *pro rata*.

Soon after this (though with how correct a knowledge of facts was a matter, as it seemed, subsequently disputed by counsel), the counsel of the insurance company on the one hand, and of the shippers on the other, agreed upon a statement of facts, and on it the company brought suit in the Superior Court of Buffalo, to test the liabilities of the shippers upon the facts as then supposed. The insurance company, however, acting herein against the urgency of their agent at Detroit, "who never expressed but one opinion, which was, that the carriers were liable and ought to be sued," after some time discontinued this suit.

After this, that is to say, in July, 1862, and through the same agent, the claim of the company on the carriers was sold to one Barrell, for about $2300.

Libels were now filed, August, 1862, in the District Court of Illinois in the names of the owners of the wheat, claiming damages for the non-delivery of it. After hearing, the libels were dismissed. Thereupon an appeal was taken to the Circuit Court.

Barrell now presented his petition to that court, stating that the underwriters had assigned their interest in the cargo to him, and that he was equitably interested and entitled to intervene, and have the benefit of both of the above libels. On this petition the Circuit Court consolidated both causes, and made order that he be subrogated to all the rights of the libellants, and that he have leave to file an amended libel. He did accordingly file such a libel, alleging the shipping of the cargo on board the Mohawk; that the propeller left port *in good and seaworthy condition,* and that after the voyage was more than half completed she was carelessly grounded on the St. Clair Flats. He also alleged the abandonment, and averred that the underwriters had suffered damages on account of the injury to the wheat, as well as for the non-delivery of the 1100 bushels detained by the propeller; and that he, as assignee of the insurance company, was entitled to recover therefor.

To this libel answer was made, denying negligence in grounding the vessel; admitting the non-delivery of the 1100 bushels of wheat, and asserting a right to hold it for freight; both that earned on the wheat actually delivered at St. Clair Flats, and on the 1100 bushels transported to Buffalo; abandonment was admitted; any assignment from the insurance company was denied; and the character of that transaction set forth with allegations, in substance, that it savored of *maintenance.* The substance of this answer was also proved.

The note at thirty days for $1200, given by the purchaser Phelps, was still in possession of the insurance company.

The Circuit Court affirmed the decree of the District Court, and the case was now here, on the action of Barrell, for review.

The appellant made two claims:

1. To have damages for injury to the cargo by the sinking of the propeller.

2. To have the 1100 bushels which the propeller had re-

tained, or their value, upon paying the freight earned on that parcel only.

*Mr. S. W. Fuller, with whom was Mr. Roe, for the appellant:*

The first and chief question is, whether the carriers, having lost the body of the wheat through an explosion of a boiler, their own fault, they are discharged from obligation to pay the loss, owing to the insurers, who in this matter are the owners, having directed the sale of that portion of the wheat, in the circumstances of this case?

The moment of the disaster was, of course, an exigent one. The thoughts of all parties were directed obviously, and in an amicable spirit and mode of action, to saving the cargo, or of doing the best by it that circumstances allowed. In regard to everything but the matter of freight, all parties were of one mind; and the difference about this was adjusted in the same spirit which seems to have animated them in everything that was done, a spirit of present effort for the benefit of all concerned. A remission was accordingly made until a future time of the only question of difference arising. But this did not interfere with the common effort for the common advantage. It is in this way, that upon the evidence we see the parties; and upon it, we see them in no other. Least of all do we discover in what they do an attempt to fix liabilities where none existed, or to discharge them where they did. No doubt, it was the right and duty of the carrier to transport the cargo to Buffalo, according to the terms of the bills of lading, in order to earn and become entitled to freight; but the disaster to the propeller, whereby the wheat was damaged, having rendered it necessary and proper for all concerned, to join in saving as much of it as could be, the effort of the insurance company to help him, neither entitled him to full freight, nor released him from liability for loss occasioned by his negligence. Whatever acceptance was made, was in some sort compulsory and for the carrier's benefit.

We have assumed that the explosion was through the carrier's fault. Certainly it was so. An explosion is not a

"danger" incident to navigation, any more than the breaking of a chain on quiet water, or the falling of a mast when there is no wind.* It occurs either from defect in the boiler, or from negligence in the engineer. Perils arising on the sea are not necessarily perils arising from the sea.

But if the vessel is not liable for the whole value of the wheat, it ought surely to demand freight upon only what it has delivered. All our preceding observations apply to this part of the case.

*Mr. Beckwith, contra:*

1. The insurers accepted and took possession of the damaged wheat and sold it to Phelps, and requested the propeller to deliver the property at the St. Clair Flats; they then took his note for the price. The sale was then completed, and the purchaser invested with title as against the insurers. How can they set up a claim of any kind for the non-delivery of the wheat, even supposing that the explosion did happen through their own fault,—after thus taking it off the carrier's hands and preventing his delivery of it? But

2. The explosion was not through the carrier's fault. The *immediate* cause of damage was the sinking of the vessel; the vessel was sunk by the explosion of its boiler; the boiler exploded in an effort to set afloat the grounded vessel; and the vessel was grounded in the channel of the St. Clair Flats, without fault of its officers or men. It is admitted that the propeller left port *in good and seaworthy condition;* and she continued her voyage until she was grounded. Nothing had occurred, in the meantime, to disturb the good and seaworthy condition in which she set out. The admission applies as well to the condition of the boiler at the time of leaving; and, as nothing is shown to have occurred after the vessel left port to render the boiler defective, it is wrong *to presume* that the explosion occurred from a defect in the boiler.

3. Independently of all this, another matter, in its nature preliminary, though here put last, deserves attention from

* Bulkley *v.* Naumkeag Steam Cotton Company, 24 Howard, 386, affirming The Bark Edwin, 1 Sprague, 477.

the bench.  Barrell's standing in court is that of a volunteer purchasing and prosecuting a claim which his alleged assignor declined to prosecute or insist upon.  The assignment did not transfer a legal title, and has merely an equitable operation.  In considering the *locus standi* of the assignee, equitable considerations will therefore govern.  The assignment savors of *maintenance;* the right thereunder is claimed by a volunteer; and in a court of equity the appellant would not, for these reasons, be entitled to relief.*  And in such a case, where a court of admiralty is called on to aid a party standing upon an equitable right, it will follow the rules of equity, and deny relief.†

*Reply.*—*As to the question of the appellant's status.*  The law subrogated the insurance company to the rights of the owners of the damaged cargo, and, in ignorance, the insurance company sold to the appellant a claim, which it regarded as worthless.  Then, after suits had been brought in the names of the owners of the cargo, the court, for economy and convenience, allowed the two suits to be consolidated, and the real owner of the claim to be admitted to prosecute the suit.  In this there was nothing champertous; nothing but what was sanctioned in *Cobb* v. *Howard et al.*‡  As Grier, J., said, in the *Propeller Monticello* v. *Mollison.*§

"The respondent is not presumed to know, or bound to inquire, as to the relative equities of parties claiming the damages. He is bound to make satisfaction for the injury he has done. When he has once made it to the injured party, he cannot be made liable to another suit at the instance of any merely equitable claimant."

Both the 34th and 43d rules in admiralty justify what was done.

Mr. Justice NELSON delivered the opinion of the court. The insurance company, having accepted the abandon-

---

* Ward *v.* Van Bokkelen, 2 Paige, 289.
† Brig Ann Pratt, 1 Curtis, 342.          ‡ 3 Blatchford, 524.
§ 17 Howard, 155.

ment of the wheat by the owner, after the disaster to the vessel, became subrogated to all the rights of the shipper, and might have left the responsibility upon the master to refit his vessel, or procure another, and forward the wheat to its port of delivery, according to the contract in the bill of lading. The vessel could have been refitted within a short time; and this port was but a few days' navigation from the place of the disaster. Besides, it occurred in the track of vessels from Chicago, and other ports on the upper lakes, and there could have been but little difficulty in procuring the shipment in another vessel.

But no choice was left to the master, whether to refit his vessel or send on the cargo in another, or to communicate with his owners, who were in Buffalo, as to the proper course to be pursued. The second day after the disaster, the agent of the insurance company appeared with instructions to take possession of the damaged wheat, and sell it as it lay in the vessel. Possession was given up accordingly, and the wheat sold on the same day, the sale perfected, and a delivery into lighters commenced to the purchaser. After this, the com-pany fearing that the master would charge freight upon this damaged wheat, countermanded the original order to sell, unless the master would relinquish it. This he declined to do, but suggested to the agent the sale was a favorable one, and that the question of freight might remain for after-consideration; which was agreed to.

We think it quite clear that the counter order, not to sell, came too late. The wheat had been turned over into the possession of the agent, who had sold it, and a portion had been delivered from the vessel to the purchaser. The agent had received complete possession and control of the wheat, and thereby rescinded the contract in the bill of lading for further shipment; and it required the assent of both parties to revive it. This counter order, however, and the action under it, are significant of the intent of the insurance company in accepting the delivery of the wheat. It was to receive the possession in discharge of any further responsibility of the vessel. The only thing in controversy was the claim

of freight, and, undoubtedly, if the counter order had not been too late, unless the master had consented to give up the freight, he could have been compelled to forward the wheat as per bill of lading, or be answerable for the refusal or neglect.

In cases where the disaster happens in consequence of one of the perils within the exception in the bill of lading, or charter-party, the only responsibility of the vessel is to refit, and forward the cargo, or the portion saved, or if that is impracticable, to forward it in another vessel, and the owner is then entitled to freight. If part of the cargo is so far damaged as to be unfit to be carried on, the master may sell it at the intermediate port, as the agent of the shipper, for whom it may concern, and carry on the remainder. In this class of cases the vessel is only responsible for carrying on the cargo, being exempt from any damage by the exception in the contract of affreightment. And it is perfectly settled, that if the shipper voluntarily accepts the goods at the place of the disaster, or at any intermediate port, such acceptance terminates the voyage and all responsibility of the carrier, and the master is entitled to freight *pro rata itineris.**

The same rule, as it respects the effect of the voluntary acceptance of the goods at the place of the disaster, or intermediate port, applies in case the ship is disabled or prevented from forwarding them to the port of destination by a peril or accident not within the exception in the bill of lading.†

The only difference between the cases is, that inasmuch as, in the latter, the vessel is responsible for all the damages that have resulted from the misfortune to the cargo, the proofs of the acceptance of the goods at the intermediate port, in order to operate as a discharge of the vessel, should be clear and satisfactory. The mere acceptance in such

---

* Welsh *v.* Hicks, 6 Cowen, 504; Abbott on Shipping, 554–5, and note; 1 Parsons on Shipping, 239, n. 2; Ib. 273; Maude & Pollock, Law of Shipping, 239, 221.

† Osgood *v.* Groning, 2 Campbell, 471; Liddard *v.* Lopes, 10 East, 526; The Newport, Swabia, 335, 342; Abbott on Shipping, 452, 453–5; Hadley *v.* Clarke, 8 Term, 259; Spence *v* Chodwick, 10 Queen's Bench, 517.

cases, and nothing else passing between the parties, ought not to preclude the shipper of his remedy. It should appear from the evidence and circumstances attending the transaction that the acceptance was intended as a discharge of the vessel and owner from any further responsibility—what would be equivalent to a mutual arrangement, express or implied, by which the original contract in the bill of lading was rescinded. The ground of the exemption from responsibility of the vessel, in both cases, is the voluntary acceptance of the goods at the intermediate port. Applying these principles to the present case, we think the court can come to but one result. It falls within the second class of cases above referred to, as the explosion of the boiler was not a peril within the exception in the bill of lading.[*]

The acceptance, as we have already seen, was the voluntary act of the insurance company, without any solicitation or interference on the part of the master; and what would seem conclusive of the intent of the company in the transaction is, that they refused to bring a suit against the carrier to recover for the damaged wheat, although urged to it by the parties who afterwards took an assignment of the subject of litigation. Some $2300 was paid for a claim which, if real and substantial, amounted to $20,000.

What is still further evidence of the understanding of the insurance company of the effect of the acceptance and sale is, that they brought a suit to recover the value of the one thousand one hundred bushels of sound wheat, in the Superior Court of Buffalo alone; but even this was subsequently discontinued. The suit in the present case has been instituted by a volunteer, on a speculation; and we are not sorry that, upon the application of the principles of law governing it, the experiment must fail.

As to the freight, the cases we have above referred to establish that the master is entitled to freight *pro rata itineris* in all cases where there has been a voluntary acceptance of

---

[*] Bulkley *v.* Naumkeag Steam Cotton Company, 24 Howard, 386; S. C. 1 Clifford, 322–324; 1 Sprague, 477.

the goods at the port of disaster.   The rate is to be ascertained by comparing the portion of the voyage performed with the entire length of it.*

In the present case the goods were carried something more than half the distance; and, upon the facts as admitted in the record, the freight would exceed the value of the one thousand and one hundred bushels of wheat at the port of delivery at the time it arrived.

No balance is shown to be due to the libellant on the wheat.   The libel, therefore, was properly dismissed by the court below.

Decree affirmed.

---

\* 1 Kent's Commentaries, 230.      † 12 Stat. at Large, 257.