## C. P. OLSSON *vs.* THEO. H. DAVIES & CO.

### Submission without Action.

Hearing, January 21, 1890.   Decision, January 30, 1890.

Judd, C.J., McCully, Bickerton, Dole, JJ.

A cargo of lumber was shipped from Tacoma, Washington, bound for Montevideo. The cargo was insured in defendants' company. The vessel put into Honolulu in distress, and was condemned and the voyage was broken up and a vessel for Montevideo could not be obtained here. The Master notified the owners of the cargo of the facts, who referred the matter to the underwriters, who replied, "We authorize you to sell cargo through Lloyds' Agent, if vessel has been condemned, and cargo cannot be shipped promptly."

Held, there was a voluntary acceptance of the goods at Honolulu, therefore the vessel is entitled to freight *pro rata itineris*, which was found to be the cost of bringing such goods from Tacoma to Honolulu.

### Submission.

The undersigned, C. P. Olsson, Master of the Swedish bark Ida, plaintiff, and Theo. H. Davies & Co., Agents of Lloyds and the Indemnity Mutual Marine Insurance Company, respectfully represent:

That there is a question in difference between them which might be the subject of a civil action in the Supreme Court, based upon the following facts which are agreed upon.

The bark Ida, of which plaintiff is master, sailed from Tacoma, State of Washington, with a cargo of lumber bound for Montevideo, on or about the 3d day of August, 1889.

That said cargo consisted of 477,000 ft. of lumber costing ten dollars ($10) per thousand in Tacoma, and was shipped by Jas. E. Ward & Co., of New York, to be delivered to their order at said Montevideo.

That said cargo was insured in Indemnity Mutual Marine

Insurance Company, and at Lloyds, but that these parties are not informed whether the freight thereon is insured or not.

That upon the 10th day of October, 1889, said bark put into Honolulu in distress, that her cargo was discharged for the purpose of making an examination of her condition, and upon survey said bark was found to be unseaworthy and condemned as unfit for repair.

That in consequence of the condition of said vessel said voyage was broken up. That it is impossible for the master to obtain another vessel in the Hawaiian Kingdom to carry said cargo on to its port of destination.

That the plaintiff notified the owners of the cargo of the foregoing facts, who replied that they had referred the matter to the underwriters, that the latter by telegram authorized the plaintiff as follows: "We authorize you to sell cargo through Lloyds' agent if vessel has been condemned and cargo cannot be transhipped promptly."

That the plaintiff is ready to sell the cargo as above authorized, which can be sold in Honolulu for about $16 per thousand, but claims that he is entitled to freight from Tacoma to Honolulu, and has a lien on the cargo for the same, as well as for expenses incurred in discharging said cargo in Honolulu, and in piling, storing and insuring the same against fire, and that upon a sale of said cargo would be entitled to a lien upon the proceeds from the same in consequence of the authority given him to sell, all of which claims the defendant disputes.

That it was necessary to discharge said cargo in order to examine the condition of the vessel.

That the usual freight upon such a cargo from Tacoma to Honolulu is the sum of $6.50 per thousand, that there is no established rate of freight from Honolulu to Montevideo, and to carry said cargo a vessel would have to be obtained in the United States.

And it is agreed that the question as to the liability of the cargo to the payment of freight from Tacoma to this port, as well as for said other costs and expenses, or any part of the same respectively, shall be submitted to Your Honors.

The charter party, bill of lading and all correspondence between the parties filed herewith shall be taken as a part of this submission.

CORRESPONDENCE.

The correspondence referred to in the submission, and made a part thereof, is as follows :

NEW YORK, July 2, 1889.

MASTER BARK IDA, Puget Sound:

DEAR SIR : After receiving on board your vessel a full cargo as per your charter party, and having signed bill of lading therefor, you will please proceed to the port of Montevideo and upon your arrival report to Messrs. Giosul Bonomi & Sons, who will give you instructions for the discharge of your cargo.

Wishing you a pleasant and speedy voyage,

We are, yours truly,

JAMES E. WARD & Co.

---

HONOLULU, Nov. 16, 1889.

MESSRS. JAMES E. WARD & Co.,

P. O. Box 1023, New York :

GENTLEMEN : The Swedish bark Ida, Capt. Olsson, came into this port on Oct. 10th, in a leaking condition. His papers show that she has a cargo of lumber on board for your account from Tacoma to Montevideo for order. The cargo had to be discharged and is now piled in proper manner and in a good place, for your account, and I have insured the cargo against fire risk. Repairs to the vessel, ordered by our local surveyors, will cost more than three-fourths of the sum insured and therefore the vessel will have to be condemned and sold.

Will you please inform me what you intend doing with the cargo? It will hardly be possible to charter a vessel here to take the cargo on to Montevideo, but I think there will be no difficulty in selling the same here and realize cost or very

nearly cost. If you have no one else I shall be glad to attend to this here for you.

Awaiting your reply by return of mail,

I remain, gentlemen, respectfully yours,

C. Bolte, Acting Consul.

---

San Francisco, 13 Dec., 1889.

The Captain Swedish Bark Ida, Honolulu, H. I. :

Dear Sir : Under telegraphic instructions received to-day from Lloyds' agent at New York, we beg to append copy of telegram for you : Write Captain of Ida, Honolulu, we, Lloyds' agents, New York, and Indemnity Mutual Marine Insurance Company, holders of endorsed bills of lading and charter party, authorize you to sell cargo through Lloyds' agent, if vessel has been condemned and cargo cannot be transhipped promptly : to which we would ask your attention and will thank you to acknowledge receipt of this letter in due course.

We are, dear Sir, Yours faithfully,

Cotton, Bell & Co.

---

Opinion of the Court, by Dole, J.

Under the circumstances shown by the submission, the question whether or not the underwriters have voluntarily accepted the goods at Honolulu must be decisive of the case. It is established by all the authorities "that if the shipper voluntarily accepts the goods at the place of disaster, or at any intermediate port, such acceptance terminates the voyage and all responsibility of the carrier, and the master is entitled to freight *pro rata itineris*." *Propeller Mohawk*, 8 Wall., 161 ; *Hunt vs. Haskell*, 24 Me., 342; 1 Parsons' Shipping and Adm., 239, 240, and 239, note 2.

The defendants' counsel contends that there has been no voluntary acceptance, but one " from necessity, in case the master chooses to give up the cargo."

It seems to us that the correspondence above set forth proves that the underwriters made a proposition to the plaintiff, which being accepted by him amounts to a voluntary acceptance of the cargo on their part. The plaintiff notified the owners of the arrival of the vessel at Honolulu in distress, of the discharge of her cargo for the purpose of making an examination of her condition, of her condemnation or the probability thereof, and of the impossibility of procuring another vessel at the Hawaiian Islands for transporting the cargo to its destination. The owners were also requested to state their intentions in regard to the cargo, and were informed that a sale here would realize cost, or very nearly cost. The owners replied that they had referred the matter to the underwriters, now the defendants, who telegraphed to the plaintiff: "We * * * authorize you to sell cargo through Lloyd's agent if vessel has been condemned and cargo cannot be transhipped promptly."

Upon the receipt of this telegram the vessel had been condemned, and it was clear that the cargo could not "be transhipped promptly;" and the plaintiff acceded to the request and authorization of the underwriters, and is ready to sell the cargo as soon as the issue before the Court is disposed of.

The underwriters might have refused to receive the cargo at Honolulu, and, upon a failure of the plaintiff to deliver it at Montevideo, would not have been liable for any part of the freight and would have had their remedy against the shipowners for non-performance of the charter party. On the other hand, the master might have refused to allow a sale of the cargo in Honolulu and insisted on his right to deliver it at Montevideo, and thereby to earn his whole freight, and would in that case be entitled to a reasonable time to procure another vessel for that purpose. Neither of these courses were pursued, but instead, the underwriters made a proposition to the master to sell the cargo at Honolulu, and the master consented thereto. This was a voluntary acceptance ; the contract contained in the charter party, for delivery of the cargo at Montevideo at a certain rate of freight, was waived by mutual consent, which waiver relieved the defendants of the obligation to pay the freight mentioned in

the charter party, and the plaintiff of further responsibility under the same, and entitled him to freight or compensation for transporting the cargo *pro rata itineris*. *Smyth vs. Wright*, 15 Barb., 53 ; 1 Parsons' Ship. and Adm., 239.

Judge Story, in *The Nathaniel Hooper*, 3 Sumn., 565–6, makes the following comment, which is applicable to the case before us : " The next question is, whether there is any just claim to a *pro rata* freight. I think there is. Taking all the circumstances together, I think the farther prosecution of the voyage has been abandoned or waived by both parties. The ship-owners have sold their ship, and can no longer complete it. The under-writers on the one-third of the cargo have not asked to have the voyage prosecuted. The owners of the other two-thirds have asked it, but under circumstances in which it became impossible for them to ship it. The parties have therefore withdrawn from the contest, without having been able to prosecute the voyage, or effectually to seek its prosecution beyond the port of Boston. The just operation of the law upon this state of things, in my judgment, is that which I have indicated. The owners of the cargo are content to take their goods here, and the ship-owners to leave them here. It is, if I may so say, a reluctant acquiescence forced upon them by an overruling necessity. I shall therefore decree a *pro rata* freight."

It is implied by defendants' counsel that the master refused to forward the goods to the port of destination, and therefore the acceptance by the defendants under such circumstances does not in law imply a promise to pay freight to the intermediate port. We are unable to find in the submission any evidence whatever, either direct or inferential, that the master refused to tranship the goods ; neither is there any evidence that the defendants insisted upon the performance of the contract. So far as we can gather from the case as submitted to us, they freely and willingly, after being in possession of the facts, adopted the plan of giving up the voyage, dissolving the charter party and closing out the cargo in Honolulu ; they preferred this to a tranship-ment of the cargo, unless such transhipment could be made promptly, which was impossible. The cases quoted by de-

fendants' counsel as authority upon this point are hardly applicable; that portion of the case of *The Nathaniel Hooper*, 3 Sumn., 550, referred to, and *Vlierboom vs. Chapman*, 13 M. & W., 239, raised the question of *pro rata* freight, which was not allowed, upon perishable goods, which had been sold from absolute necessity by the master in an intermediate port.

*Caze vs. Balt. Ins. Co.*, 7 Cranch, 361, was a case of abandonment: and *Metcalf vs. Britannic Ins. Co.*, 2 Q. B., 423, affirms the rule which we have recognized, but disallowed *pro rata* freight, solely on the ground that there was no evidence of a mutual waiver of a prosecution of the voyage, or of a voluntary acceptance of the goods at the intermediate port.

In regard to the rule for ascertaining the amount of freight to which the master is entitled, we find that several methods have been adopted by the Courts. Parsons, in 1 Shipping and Admiralty, 243, says : " It is not quite certain how the proportion shall be calculated when *pro rata* freight is due. There are in fact but two ways of doing this. The part of the voyage for which freight is to be paid may be a geographical part or a commercial (meaning a pecuniary) part. That is, the shipper may be held to pay, as in the earlier cases, so much per mile or league for what has been done out of the whole voyage, or else so much as it would cost to bring them to the port at which the goods are accepted. Every rule must be a modification of one of these. The latter rule is that which we think is favored and will be generally adopted in this country." This latter rule is supported in the case of *Coffin vs. Storer*, 5 Mass., 251.

We are unable for want of data to use the first rule, and would, in any case, prefer the second in an issue like the one before us, in which the defendants appear to be benefited by the transportation of the goods to Honolulu in an amount nearly coinciding with the regular freight from Tacoma to Honolulu, which is agreed upon in the submission as $6.50 a thousand, which, with the purchase price of $10, is about equivalent to the market price in Honolulu.

We allow the plaintiff freight accordingly, with the accustomed rates for pickets, laths and short lengths, and also his necessary

4

expenses for the removal from the dock, piling and insurance of the cargo, but not for the expense of discharging the same, the charter party providing for the delivery of the cargo from the ship's tackles.

*A. S. Hartwell*, for plaintiff.

*F. M. Hatch*, for defendant.