## THE ELVASTON.

### SPANTON & CO. v. CENTURY SHIPPING CO. et al.

(Circuit Court of Appeals, Fifth Circuit. April 4, 1922. On Motion for Modification of Decree, May 25, 1922.)

### No. 3668.

1. Shipping ⟨key⟩132(5)—Testimony of witness on shore to stranding not conclusive against silence of log book and protests.

Testimony by a witness on shore that the vessel stranded before she listed, so as to require the removal of a portion of her deck cargo, which would bring the cause of the loss of cargo so removed within an exception in the bill of lading, is not conclusive against the shipper, where the log book of the vessel and the original and supplemental protests made by the master did not mention a stranding at that time, though they did mention one later, and attributed the listing of the vessel to a leak in a ballast tank.

2. Shipping ⟨key⟩117—Vessel liable for cargo removed and left without necessity before reaching destination.

The contract of affreightment obliged the carrier, in the absence of a legal excuse, to carry the freight to the destined port stipulated in the bill of lading, and the vessel is liable for cargo removed therefrom and left without necessity at a place short of its destination.

3. Shipping ⟨key⟩130—Master should notify cargo owner, if possible, of necessity for removing part of the cargo.

If it became necessary for a vessel to discharge part of its cargo before reaching its destination, the master should notify the owner of the cargo, if possible; and the vessel is liable for failure to give such notice, as the result of which the owner was unable to insure his goods against destruction by fire after they had been removed from the vessel.

4. Shipping ⟨key⟩130—Vessel held liable for loss of lumber burned after removal from vessel.

Where a vessel, on breaking ground at the port of shipment, listed because of a leak in the ballast tank and returned to dock, but there was no evidence that the leak could not have been repaired at that port, and no notice of the situation was given to the owner of the cargo, the vessel is liable for the burning of a portion of the cargo, which was unloaded at port because of the condition of the vessel, regardless of whether the

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

leak in the tank was caused by a stranding, which was excepted by the bill of lading, or by the unseaworthiness of the vessel.

### On Motion to Modify Decree.

5. Interest ⬦⟿39(1)—Shipping ⬦⟿132(1)—Right of action for part of cargo wrongfully unloaded accrues before arrival of vessel at destination.

A shipper's right of action for a part of a cargo of lumber, wrongfully unloaded by the vessel before departure from the port and burned after unloading, accrued on the destruction of the lumber, and not on the arrival of the vessel at its destination, so that interest should be allowed on the value of the lumber from that date as damages for delay in paying the loss.

6. Interest ⬦⟿28—May be awarded at rate prevailing where suit was brought.

It is permissible to award interest at the rate prevailing at the place where suit was brought for loss of goods misdelivered, without requiring proof of the rate of interest payable at the port of destination of the cargo.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Libel in admiralty by Spanton & Co. against the Century Shipping Company, claimant of the steamship Elvaston, and others. From a decree dismissing the libel, libelant appeals. Reversed, with directions to enter a decree in favor of libelant.

Henry P. Dart, Jr., of New Orleans, La. (Vincent F. Kilborn, of Mobile, Ala., on the brief), for appellant.

Victor Leovy, of New Orleans, La., Palmer Pillans, of Mobile, Ala., and George Denegre and Henry H. Chaffe, both of New Orleans, La. (Denegre, Leovy & Chaffe, of New Orleans, La., and Alexis T. Gresham, of Mobile, Ala., on the brief), for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. The steamship Elvaston was chartered to carry from Mobile, Ala., to Buenos Aires Roads for orders "a full and complete cargo of pitch pine sawn timber, * * * not exceeding what she may reasonably stow and carry over and above her tackle, apparel, provisions, and furniture." The charter party contained the following provisions:

"The master shall give reasonable notice of cargo required, and should he order more cargo alongside than can be taken on board the expense of returning the same to the owners or the wharf to be borne by the owners of the steamer. * *. * Charterers or their agents to provide and pay a stevedore to do the stowing of the cargo under the supervision of the master. * * * Charterers' responsibility under this charter to cease as soon as the cargo is shipped and the bills of lading signed."

The vessel received, and its master issued a bill of lading for, 2,932,-301 feet of pitch pine lumber, 2,325,220 feet of which was under deck and the remainder was on deck. By the terms of the bill of lading:

"Jettison, fire, * * * strandings, accidents, faults, or errors in navigation or in the management of said steamer, accidents to hull, * * * or latent defects therein, although existing at the time of shipment, and although occasioned by the faults or errors in judgment of the pilot, * * * or other persons in navigation or in the management of the steamer, * * * always mutually excepted."

---

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The libel, which was filed by the appellant, the assignee and owner of the bill of lading, charged that there was a failure to deliver at Buenos Aires 124,991 feet of the lumber shipped, and claimed the alleged value of the lumber shipped and not delivered, and the amounts of stated charges and expenses incurred by the libelant. The vessel was loaded while lying in a slip at the wharf. While tugs were pulling it, stern foremost, out into the dredged channel, it listed badly. Thereupon it was brought back, and part of the lumber on deck was transferred to barges, employed by the vessel, by which it was carried to a dock across the river, and about a mile from where the vessel was lying for the purpose of storing the lumber on that dock. After the vessel had proceeded on its voyage, and before the unloading of that lumber from the barges to the dock was completed, all of it was destroyed by fire. No insurance on the lumber so destroyed was paid, as the destruction by fire of the lumber after it was removed from the vessel was not a risk covered by the policies insuring the cargo. Reference will be made to evidence as to the cause of the listing of the vessel, and as to the circumstances under which it discharged part of its cargo and resumed its voyage. The libel was dismissed. The libelant appealed, and complains of the disallowance of its claim to the value of the lumber alleged to have been shipped and not delivered at Buenos Aires.

[1] For the appellant it was contended that the mishap which occasioned the removal from the vessel of part of the lumber on deck was attributable to the unseaworthiness of the vessel when it started on the voyage, in that one of its ballast tanks was in a leaky condition, with the result that the ballasting was ineffective. For the appellee it was contended that the discharge of part of the lumber on deck was due to a stranding which occurred before the vessel got into the dredged channel. Testimony of J. M. Walsh was relied on to support the just-mentioned contention of the appellee. Mr. Walsh is a contracting stevedore, and the president of the corporation which loaded the cargo on the vessel under the superintendence of the master. He testified that he was on the dock when the ship was pulled out towards the dredged channel, and that about 10 minutes after she left the slip she grounded, and thereafter listed to starboard. The vessel's log, a report of a survey made after the vessel returned to the wharf, and a protest and supplemental protest made by the master after the vessel reached Buenos Aires were in evidence. There was nothing in the log, in the report of the surveyors, or in the master's protests, to indicate that the vessel grounded or stranded before the list occurred. The following is an extract from the log, of the date of the vessel's sailing:

"6:50 a. m. engines rang 'Stand by.' 7 a. m. Cast off from wharf and backed into channel; steamer having port list, stopped and put steamer ahead; with bow against quay and tug pulling on starboard quarter, steamer listed to starboard; opened No. 5 tank to stiffen steamer; vessel held in position by tug and engines worked as required. When tank filled, list increased, and on sounding round found a considerable quantity of water in after bilge starboard side (pumped out, but water still making; entries engineer's log). Came to conclusion No. 5 tank leaking as bilge previously being reported dry; hove ship to quay and made fast."

The following is an extract from the report of the surveyors:

'In order to ascertain the cause of list and excessive draft, we sounded all tanks, bilges, and peaks, and found as follows: Fore peak dry; No. 1 tank dry; No. 2 tank full; No. 3 tank full; No. 4 tank full; No. 5 tank containing 3 ft. 1 in. of water. The bilges were all dry, except in starboard No. 5 bilge we found 1 ft. 5 in. of water (for full particulars see chief officer's log book).

"We recommend that No. 5 tank and bilge be pumped dry and sufficient deck cargo be discharged to bring steamer to her proper draft and putting her in a seaworthy condition."

The protest contained the following:

"That on the 26th of October, with the pilot on board and with two tugboats alongside, the steamer sailed from the wharf to enter the canal. That under those circumstances the steamer listed towards the port side, and, when giving steam ahead, the prow struck against the breastwork. That, upon the tugboat lugging on the starboard quarter, the steamer then listed starboard. That in spite of having worked the tugboat and the engines, the listing increased, and, upon sounding the tanks, a great quantity of water was found in the bilge of No. 5; the conclusion being arrived at that No. 5 had a leakage. That, under those circumstances, it was decided to turn the steamer back to the wharf, at which she was again moored. That it was then decided to make a survey, and in the afternoon the steamer was taken to another place awaiting survey to be made. That, early the following day, the surveyors appointed by Lloyd's agent met, who advised drying out tank No. 5 by means of the pumps, and that part of the cargo should be discharged in order to leave the steamer drawing a draft which would be convenient in the case. That, consequently, immediately began to unlash the cargo on deck, beginning discharge of the lumber, first aft and then forward."

The supplemental protest contained the following:

"That the cause of the listing was the great leakage of water produced in the tank No. 5, as, upon sounding the bilges alongside of said tank, a great quantity of water was found."

Certainly those on board the vessel had a better opportunity to know whether it did or did not run aground before the listing occurred than a person who saw it from the land and testified about what happened to it 10 minutes after it left the dock. It may be inferred that, if a grounding or stranding occurred before the vessel listed, mention of that fact would have been made in the log and in the protests. It is to be noted that the protest mentions a later grounding, which caused no damage, and did not appreciably interrupt the voyage. One on shore, who was observing the vessel when she was being pulled out into the channel, may have mistakenly concluded that she ran aground before she listed. There is nothing to indicate that any one on board attributed the leaking of one of the ballast tanks to damage caused by a grounding or stranding of the vessel after it left the dock, and before part of its deck load was discharged.

In view of the circumstances mentioned, Mr. Walsh's version of the incident, based on what he casually saw from shore when the vessel was a considerable distance from him, well might be considered as not convincing. A phase of the evidence adduced indicated that the vessel listed, not as a result of a stranding, which caused a ballast tank to leak, but because one of its ballast tanks was leaking when the vessel first broke ground. But it is not necessary to determine whether the

vessel did or did not start on the voyage with a leaky ballast tank, or whether it was or was not rendered unseaworthy when the voyage began by its ballasting being faulty in consequence of that defect.

[2] If the return of the ship to the dock was due to a stranding, within the exception contained in the bill of lading, it does not follow that, as to the part of the cargo which was discharged at the loading port, the ship's liability as carrier was terminated by what occurred. The evidence warranted a finding that, but for the leaking of one of its ballast tanks, the vessel could have carried safely to its destination all its cargo, as it was stowed when the vessel broke ground. The contract of affreightment obliges the carrier, in the absence of a legal excuse, to carry the freight to the destined port in the vessel stipulated in the bill of lading. The vessel is liable for cargo removed therefrom and, without necessity, left at a place short of its destination. The Maggie Hammond, 9 Wall. 435, 459, 19 L. Ed. 772; Trott v. Wood, 24 Fed. Cas. 218, No. 14,190; Calderon v. Atlas Steamship Co. (D. C.) 64 Fed. 874; Cox v. Foscue, 37 Ala. 505, 79 Am. Dec. 69. If the vessel needed repairs and a restowing of part of its cargo before proceeding on its voyage, those things should have been done, if they were reasonably practicable. Propeller Mohawk, 8 Wall. 153, 161, 19 L. Ed. 406; Trott v. Wood, supra; Carver on Carriage of Goods by Sea, §§ 302, 303.

[3] If it was impracticable to have the faulty ballast tank repaired at Mobile and to put back on board the lumber which was removed, the master was under a duty to communicate with the owner of the removed lumber, if it was practicable to do so. He had no authority to deal with that lumber as he did, if he could have communicated with its owner and failed to do so, with the result that the owner's insurance was avoided, and no opportunity afforded to get other insurance. The Convoy's Wheat, 3 Wall. 255, 18 L. Ed. 194; The Hamburg, 15 English Reprint, 911; Carver on Carriage of Goods by Sea, §§ 295–299. The following was said in the opinion in the case of The Maggie Hammond, supra:

"Duties remain to be performed by the master or the owner, after the vessel is disabled. His obligation of safe custody, due transport, and right delivery still continues, and is by no means discharged or lessened while it appears that the goods have not perished in the disaster. Nothing will excuse the carrier under such circumstances but the causes stipulated in the bill of lading, and he is still bound by virtue of his original contract to use his utmost exertions to transport or send forward the goods to the port of delivery. Such carriers may be answerable for the goods in case of loss or injury, even though no actual blame can be imputed to them; and after the loss or injury is established the burden lies upon the respondent to show that it was occasioned by one of the perils excepted in the contract of shipment or bill of lading."

[4] There was no evidence to warrant a finding that it was impracticable to have the leaky ballast tank repaired at Mobile, or to have the removed lumber replaced on board and restowed, so that it could be safely carried. Testimony of Walsh was the only evidence on the subject of putting the removed lumber back on the vessel. To the question, "Why didn't you reload the lumber on the ship, and allow her to carry it to sea with her?" his answer was:

"Because I saw the captain, and he did not want it put back aboard the vessel. He told me to take it off and find a place to put it."

There is nothing to indicate that the master made any effort to communicate with the shipper of the lumber before it was taken to the place where it was burnt up, or that the master did not know or could not ascertain the shipper's address. The evidence adduced was consistent with the conclusion that the lumber which was destroyed by fire was left at the loading port without any necessity or reasonable excuse for doing so. At any rate, the claimant did not prove a legal excuse for the failure to carry to its destination the part of the cargo which was destroyed by fire after it was discharged from the vessel, to be stored, uninsured, at an isolated place remote from means of protection against fire. In the absence of such proof, the vessel is to be held to its liability as carrier.

The claim made in the libel is for the value of less lumber than the evidence showed was destroyed by fire. The conclusion is that the appellant is entitled to recover the proved value of the amount of lumber which the libel alleged was short-delivered at Buenos Aires. The decree dismissing the libel is reversed, with direction that a decree be entered in favor of the libelant for the above-indicated amount, with interest and costs.

Reversed.

### On Motion for Modification of Decree.

PER CURIAM. In behalf of the appellees it is suggested that the decree should be modified by striking out the part of it which requires the payment of interest. The suggestion is based on the absence of evidence as to the rate of interest prevailing at Buenos Aires, the place of delivery under the contract of carriage. It is contended that the right of action enforced did not arise until the ship reached Buenos Aires and failed to deliver part of the lumber shipped, and that, if interest on the amount of the loss then disclosed was allowable, only the proved rate prevailing at the place of destination properly could be adopted.

[5] We do not think that these contentions should prevail. The accrual of a right of action based on the breach by the carrier of its duty or obligation was not postponed until the ship arrived at the destination of its cargo. A right of action accrued to the shippers or their assignee upon the wrongful discharge of part of the lumber after it was received for carriage and the loss by fire of that part of the cargo. Both the wrong and the damage were then consummated.

[6] Interest is allowable as compensation or damages for the delay in paying the amount of the loss so caused. It is permissible to award interest at the rate prevailing at the place where the suit was brought. Goddard v. Foster, 17 Wall. 123, 143, 21 L. Ed. 589; The Scotland, 105 U. S. 24, 26 L. Ed. 1001. The suggestion made is not approved.