**UNITED PURVEYORS, INC., a Florida corporation, Libelant,**

v.

**MOTOR VESSEL NEW YORKER, her engines, tackle, apparel, furniture, appurtenances and necessaries thereunto appertaining, and every part thereof, et al., Respondents.**

No. 64–73.

United States District Court,
S. D. Florida,
Miami Division.

Sept. 23, 1965.

2. Tr. 55, 60, 93, 94, 96, 101, 104, 124, 126, 135–36, 147, 148, 151, 159, 180, 181.

Allen Kornblum, of Myers, Heiman & Kaplan, Miami, Fla., for libelant.

Frank J. Marston, of Fowler, White, Gillen, Humkey & Trenam, Miami, Fla., for respondents.

MEHRTENS, District Judge.

THIS CAUSE came on for trial before the Court sitting without a jury upon Libel In Rem and In Personam, for cargo damage filed on behalf of Libelant, UNITED PURVEYORS, INC., and against the M/V "NEW YORKER", EAGLE, INC., and SOUTH ATLANTIC AND CARIBBEAN LINE, INC. The Court having considered the evidence, including exhibits filed herein, and Briefs of Proctors for the respective parties and Pre-trial Stipulation, now makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1.  At all material times, Libelant is a corporation organized and existing under the laws of the State of Florida.

2.  The Respondent, M/V "NEW YORKER", is a cargo ship engaged in the common carriage of merchandise by water for hire in foreign and international commerce, and was at all material times owned, operated and controlled by Respondent, SOUTH ATLANTIC AND CARIBBEAN LINE, INC.

3.  At all times pertinent hereto, Respondent EAGLE, INC. was authorized by Respondent SOUTH ATLANTIC AND CARIBBEAN LINE, INC. to act as its Miami agent in connection with the operation and control of the vessel "NEW YORKER" which authority included signing of bills of lading on its behalf.

4.  During 1963 Libelant was engaged in the business of importing frozen seafood from Mexico to San Juan, Puerto Rico. Shipments were made at the request of Dixie Provisions Co., San Juan, Puerto Rico, and would be sold by it in Puerto Rico on behalf of the Libelant, from which sales a commission was received by said Dixie Provisions Co.

5.  Prior to May 31, 1963, Libelant arranged for the shipment of 67,000 lbs. of grouper fish from Progreso, Mexico, to San Juan, Puerto Rico, through its agents in Mexico, and that thereafter the cargo was shipped from Progreso to Miami, Florida, aboard the vessel M/V "MADA", owned by A. & S. Corporation.

6.  On June 5, 1963, Libelant fully paid the purchase price for the cargo.

7.  On or about May 31, 1963, with the consent and approval of the Libelant, a Mr. Marion Leonard of Sanda Corporation, local representative of the M/V "MADA", arranged with Respondent EAGLE, INC. for carriage of the cargo from Miami to San Juan, Puerto Rico, via the M/V "NEW YORKER".

8. The general practice of Respondents EAGLE, INC. and SOUTH ATLANTIC AND CARIBBEAN LINE, INC. was to deliver precooled semi-truck trailers equipped with refrigeration units to shippers; thereafter the trailers would be loaded and sealed by the particular shipper; the trailer would be picked up by employees working for or on behalf of Respondents and taken to the vessel "NEW YORKER" where it would await loading onto the vessel. Subsequent to loading, the power on the refrigeration units on the trailers would be switched from self-contained gasoline drive to electricity furnished by the vessel. Upon arrival in San Juan, Puerto Rico, the trailers would be off-loaded and the particular consignees notified of arrival.

9. In accord with the foregoing, two precooled refrigeration trailers, Nos. 401 and 500, were delivered dockside to the M/V "MADA" by Respondents. Thereafter the foregoing cargo, which was packed in 1,675 cardboard boxes each containing 40 lbs. of cargo, was loaded into the trailers by employees of Sanda Corporation under the supervision and control of Mr. Leonard. The bill of lading specifically provided for shippers load and count, shipper responsible for proper stowage.

10. The loading of the trailers commenced at 11:00 A.M., May 31, 1963, and was finished at 7:00 P.M., May 31, 1963. After loading was completed, the trailers, which were in bond, were taken by Respondents to Pier 3 in Miami, Florida, where they were loaded aboard the M/V "NEW YORKER" at 5:00 A.M., June 1, 1963. Trailer No. 401 contained 33,400 lbs., or 836 boxes, of cargo and Trailer No. 500, 33,560 lbs., or 839 boxes, of cargo.

11. The refrigeration unit on Trailer 401 functioned properly and without any difficulty until midnight June 1, 1963 or for 29 hours after stowage of cargo was completed, at which time the clutch bearing on the unit burned out causing the unit to stop.

12. The clutch bearing on the unit on Trailer 401 had approximately 40 hours of use prior to May 31, 1963 and it could be reasonably expected or assumed by the Respondents that said bearing would operate for a minimum of 1,000 hours without breakdown by burning out.

13. Respondents followed the manufacturer's recommended program of maintaining the refrigeration unit on Trailer 401 and in addition initiated and followed a separate maintenance program which included a test run of the unit on 401 prior to delivery to Sanda Corporation on May 31, 1963, checking the belts and pulleys on the unit and lubrication.

14. The clutch bearing on the unit was a factory sealed and factory lubricated bearing with no provision for inspection or lubrication.

15. Subsequent to midnight June 1, 1963 and prior to discharge in San Juan, Puerto Rico, 300 lbs. of bottled $CO_2$ gas were injected into Trailer 401, which is equivalent to four hours of operation of the refrigeration unit on the trailer.

16. The refrigeration unit was inoperative up to and including the time when Trailer 401 was discharged from the vessel in San Juan, Puerto Rico, at 10:30 A.M., June 4, 1963 or for 58½ hours.

17. Although there is testimony that temperatures were taken of contents of some 50 cases of the cargo during the transfer in Miami from the vessel "MADA" to Trailer 401, and that these temperatures ranged between 10° and 16° above zero, the Court finds that from the expert testimony, if this had been the case it would have required 165 hours or 6 days 21 hours subsequent to breakdown of the refrigeration unit for a one foot thick layer around the six sides of the cargo in the trailer to reach a soft state, and an additional 48 hours, for a total of 8 days 21 hours, for that cargo to spoil.

18. The Respondents exercised due diligence to make the vessel "NEW YORKER", Trailer 401 and the appurtenances and equipment involved reasonably fit for the purpose intended.

19. Although C.O. 2 gas was not injected into Trailer 401 until 12 hours subsequent to breakdown, the Court finds, in view of the testimony, that this delay did not affect the condition of the cargo and was not the cause of damage complained of.

20. Trailer 401 was discharged from the vessel "NEW YORKER" in San Juan no later than 10:30 A.M., June 4, 1963. According to the testimony of a representative of the consignee, the consignee was notified of the arrival of the cargo in San Juan and by inspection on June 4, 1963, determined that the refrigeration unit was not operating and that the cargo was soft and thawing.

21. The consignee took delivery of the contents of Trailer 401 on June 6, 1963, subsequent to having transferred them to another trailer on June 5, 1963.

22. There was a procedure available to the consignee whereby it could have obtained clearance of the cargo by United States Customs in San Juan, Puerto Rico, upon arrival or inspection of the cargo on June 4, 1963. From the testimony of the representative of the consignee, the cargo was not cleared by Customs until June 6, 1963, or some two days subsequent to arrival of the cargo in San Juan, Puerto Rico, a commonwealth with a semi-tropical or tropical climate.

23. Under the terms of the Respondents' printed regulations, Libelant guaranteed that the consignee would take delivery of the trailer immediately after discharge from the vessel, and further that the Respondent is not responsible for the condition of the cargo if the consignee fails to do so.

24. Freight charge for the transportation by Respondents was $1,000 which, by the terms of the bill of lading, covered carriage of one trailer said to contain 836 boxes of frozen fish and was charged on a "flat" basis.

25. Under the testimony and Respondent's, SOUTH ATLANTIC AND CARIBBEAN LINE, INC., printed tariff, the freight charge was computed solely with reference to the refrigerator trailer as a single unit, that is to say, that the trailer constituted the unit upon which the freight charge was based.

26. The value of the cargo was not inserted in the bill of lading nor is there any evidence that the Respondents were requested to insert it.

27. Under the evidence apparently 30,400 lbs. of the cargo were taken from the Port of San Juan by employees, or agents, of the consignee and placed in cold storage freezers. The balance of the cargo, 3,000 lbs., was sold by the consignee to various people in San Juan prior to the transfer.

28. After the transfer to the freezers the cargo was sold by consignee to various people. The average selling price of all but 4,800 lbs. (or 25,600 lbs.) of the cargo was 1.1¢ per lb. less than the average price obtained by the consignee for like cargo during the same time involved. This represents a loss of $281.60.

29. 4,800 lbs. of similar cargo were condemned by health authorities in Puerto Rico by orders dated September 20 and September 23, 1963. The Court finds, however, that the Libelant has not satisfactorily shown that this is part of the cargo carried in Trailer 401, as the Libelant had consigned other like cargo to the consignee and the consignee had received other like cargo from other parties that was also placed in freezers. Nor has Libelant satisfactorily shown that the condition of the perishable cargo that formed the basis for condemnation could be traced with reasonable certainty to its condition upon out-turn, it being noted by the Court that under the evidence some of the cargo carried in Trailer 401 was delivered to various customers by the consignee, sorted by them and thereafter returned by these customers.

30. The charges for the storage of the cargo in freezers, trucking charges from the Port of San Juan to the freezers and handling charges in connection therewith claimed by Libelant were part of the regular business operating expenses of Libelant and are not recoverable items of damage.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the Libelant, UNITED PURVEYORS, INC., and the Respondents, EAGLE, INC. and SOUTH ATLANTIC AND CARIBBEAN LINE, INC., and the subject matter of the Libel is within the Admiralty and Maritime jurisdiction of this Court.

2. By stipulation of the parties and, under the terms of the contract of carriage as evidenced by the bill of lading, the Carriage of Goods by Sea Act, 46 U.S.C.A. Sections 1300–1315, governs the rights and liabilities of the parties.

3. Libelant's recovery, in any event, is limited to $500.00 in accord with the terms and provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. Sections 1300–1315.

4. The Respondents have not breached the contract of carriage and are not responsible or liable for the damages claimed.

Final Judgment in conformity with the foregoing Findings of Fact and Conclusions of Law shall be settled and submitted by Respondents within five (5) days.