**INTER–AMERICAN FOODS, INC.,**
Plaintiff,

v.

**COORDINATED CARIBBEAN TRANS-PORT, INC., and M/V FREIGHT CON-SOLIDATOR, and M/V FREIGHT TRANSPORTER,** Defendants.

**Nos. 67–948–Civ–CA and 67–1174–Civ–CA.**

United States District Court,
S. D. Florida,
Miami Division.

June 25, 1970.

---

7. See footnote 4, *supra.*

Raymond T. Greene, Miami, Fla., and Vinson, Elkins, Weems & Searls, Houston, Tex., for plaintiffs.

Frank J. Marston, Jr., of Fowler, White, Collins, Gillen, Humkey & Trenam, Miami, Fla., for defendants.

## MEMORANDUM OPINION AND DETERMINATION UNDER 28 U.S.C. § 1292(b)

ATKINS, District Judge.

Before the Court are two actions in admiralty which have been consolidated for trial. The two actions are brought by Inter-American Foods, Inc., a Texas corporation (hereinafter IAF) in rem, against the M/V Freight Consolidator and the M/V Freight Transporter and in personam against their operator, Co-ordinated Caribbean Transport, Inc. (hereinafter CCT). Both actions seek to recover damages relating to nineteen shipments of frozen shrimp delivered by IAF to CCT at Corinto, Nicaragua, between September 19, 1966 and January 13, 1967, for transportation to Miami.

In case number 67–948–Civ–CA, IAF alleges that certain shipments arrived in Miami in various states of decomposition as a result of defrosting. The cost of processing and reconditioning the master cartons of shrimp and the market value of those master cartons condemned by United States Government inspectors under the Pure Food and Drug Act allegedly amount to $39,702.67.

In case number 67–1174–Civ–CA, IAF alleges that 339 master cartons of six boxes of shrimp were never redelivered by CCT in Miami. The market value of these lost cartons is alleged to be $22,888.42.

■ After a review of the pleadings and hearing opening statements by counsel for both parties, the Court feels there is a controlling question of law within the meaning of 28 U.S.C. Section 1292(b). There is substantial ground for difference of opinion and the ultimate determination of such issue would materially advance the litigation to a conclusion. After hearing testimony, the Court finds that a prima facie case has been made for authorizing an interlocutory appeal.

■ The question of law is raised by one of CCT's defenses. CCT contends that the loaded trailer is a package for

the purposes of limitation of liability pursuant to 46 U.S.C. § 1304(5).[1]

> "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in the case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence but shall not be conclusive on the carrier."

IAF contends that each cardboard carton (containing five boxes of shrimp and glaze aggregating 64 pounds gross weight) constitutes the package. In the alternative IAF argues that the customary freight unit of hundred weight is the proper measure thus limiting liability to less than $500 per carton and making the distinction immaterial. The intent and purpose of this section are to protect the carrier from claims by the shipper for damages to the contents of a package prepared by that shipper when the nature and value of such contents have not been declared and included in the bill of lading. The findings of fact and conclusions of law in this opinion are made for the purpose of presenting for interlocutory review the legal issues involved herein. It is intended that this memorandum opinion shall be in lieu of findings of fact and conclusions of law as contemplated by Rule 52.

The standard procedure or usual practice from receipt of the shrimp to its delivery at Matias de Galvez, Nicaragua is delineated in the following seven paragraphs.

(1) After washing and grading shrimp received from fishing vessels at Corinto, Nicaragua, the shipper places five pounds of such product into containers or small boxes containing ice or water, then places them in a plate freezer operating at minus 40° Fahrenheit where they are kept for four hours. At the end of the four-hour freezing period, the five-pound boxes are removed from the freezer and placed into master cartons consisting of ten five-pound boxes. The master cartons are made of corrugated cardboard, sealed with wax and a metal band. The master cartons of frozen shrimp are warehoused at minus 5° Fahrenheit until ready for shipment.

(2) CCT is a common carrier which offers combined overland and ocean transportation from inland cities in Central America to Miami. Freezer trailers pick up the cargo from inland shippers. The trailers are then hauled by cabs to Matias de Galvez where the trailers are rolled aboard either the M/V Freight Consolidator or the M/V Freight Transporter for ocean transportation to the Port of Miami.

(3) The general practice whenever the shipper involved in these cases wished to make a shipment was for Mr. Ernesto Prichardo, the shipper's plant manager at Corinto, Nicaragua, to telephone Mr. Roberto Chamorro, CCT's manager at Managua, Nicaragua, and ask that a trailer be sent to the plant at a stated time. CCT would then dispatch a cab and trailer to arrive at the appointed time. The trailer was backed up to a small aperture, or door, in the warehouse so that it could be loaded directly from the warehouse by means of a conveyor belt.

(4) Five people would be present during the loading of the trailer tabulating each master carton loaded.

(5) The manner in which a trailer is loaded depends upon instructions given by the driver who rejects cargo in poor condition.

(6) After the loading is completed, the CCT driver signs a receipt for the

---

1. 46 U.S.C. § 1300 et seq. is commonly known as the Carriage of Goods by Sea Act, hereinafter COGSA.

number of master cartons delivered to him, usually 620, then drives 75 miles to Managua with a copy of the receipt from which Mr. Chamarro prepares the bill of lading covering the shipment. After the bill of lading is prepared, CCT's representative delivers one copy to the truck driver to accompany the shipment and the others are sent within a day or two to the shipper. The trailer proceeds to Guatamala City and thereafter across the Isthmus to Matias de Galvez on the Gulf of Mexico side of Guatamala.

(7) CCT had two vessels, the M/V Freight Consolidator and the M/V Freight Transporter, calling at Matias de Galvez on a weekly basis. The trailers are loaded on one of these vessels for transportation to Miami.

Between September 19, 1966 and January 13, 1967, 11,860 master cartons of frozen shrimp were delivered to CCT and placed in its freezer trailers for which CCT's truck drivers signed 19 receipts covering said 11,860 master cartons, one for each of the 19 shipments. CCT subsequently issued 19 bills of lading, each of which stated that such shipments were received at Corinto, Nicaragua, in "apparent good order and condition" for transportation to Miami, Florida. On arrival at Miami there was evidence of a shortage of approximately 339 master cartons, more or less. There was also testimony that a substantial number of master cartons were wet, torn, and showed signs of thawing and refreezing. The contents of some of the cartons were in varying degrees of decomposition and emitted strong odors.

CCT had actual knowledge of the number of master cartons placed in each trailer. Each truck driver signed a receipt showing the number of master cartons delivered to him. The very purpose of the receipt was to establish the contents of each trailer.

The tariffs filed by CCT with the Federal Maritime Commission establish a freight rate from Corinto, Nicaragua, to Miami, Florida of $4.25 per hundred weight on loads of 40,000 pounds or more.

Mr. Espino agreed to a trailer load rate with Mr. Prichardo, based on a maximum weight.

Defendants submit that it was the intent of the shipper to deal with the cargo on a "trailer basis". This is shown, they urge, by the bills of lading, the savings resulting from limited handling and the expedition of the shipment.

■ In ascertaining whether a COGSA limitation is applicable, the first determination is what was delivered to the carrier. If packages were delivered, then the $500 limitation applies to each package. If no package exists, then the limitation applies to the customary freight unit which, in this case, was the hundred weight published in CCT's tariffs and which was the basis on which an average freight rate was agreed upon by the parties. Standard Electrica, S.A. v. Hamburg Sud. Dampfs. and Columbus Lines, Inc., 2 Cir., 375 F.2d 943, 945.

The shipper in these consolidated cases delivered to CCT master cartons, usually 620, which were receipted for by the drivers.

The shipper at no time delivered a trailer to CCT. To the contrary, CCT dispatched its trailer to the shipper's plant into which it received, and signed receipts for, master cartons of shrimp.

The legal conclusion contended for by plaintiff in these cases is confirmed by recent amendments to the Hague Rules, known as the Brussels Protocol, which includes a definition of the term "package" when used in connection with goods that have been "palletized" or "containerized" for more expeditious handling and transportation.

The Brussels Protocol, which was adopted on February 23, 1968, was signed by the United States delegation and is currently being offered as an amend-

ment to COGSA, reads, in part, as follows:

"Article 2

c) Where a container, pallet or similar article of transport is used to consolidate goods, the number of packages or units enumerated in the bill of lading as packed in such article of transport shall be deemed the number of packages or units for the purpose of this paragraph as far as these packages or units are concerned. Except as aforesaid such article of transport shall be considered the package or unit."

The Brussels Protocol makes it clear that each unit in "palletized" or "containerized" cargo constitutes a "package". Under the definition accepted by the leading maritime nations of the world, even where a carrier receives at dockside a sealed container, contents unknown, each package or unit enumerated in the bill of lading is deemed a package.

Defendants make much of the language contained in the bills of lading. Each bill of lading, under the column "No. of Packages." recites: "ONE TRAILER LOAD SAID TO CONTAIN * * *" Under the column "DESCRIPTION OF PACKAGES AND GOODS" we find these words: "Shrimp product of ·Nicaragua, shrimpers' weight load and count. Received on board refrigerated trailer * * *". However, CCT did not receive a sealed trailer, contents unknown, but accepted delivery of and gave receipts for specific numbers of master cartons, and at a place 75 miles distant, CCT itself made out the bills of lading.

There is no decision squarely in point by a court in the United States setting forth the principles governing limitation of liability, if any, in respect of master cartons of shrimp or other product delivered to and receipted for by a common carrier which prepares and issues its own bill of lading a day or two after transportation has commenced. A decision by the Supreme Court of France in respect of the contents of a sealed container delivered to the carrier without its knowledge as to the contents thereof is persuasive in view of the United States Supreme Court's decision in Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820. There, in commenting on the history of COGSA, the court observed at p. 301, 79 S.Ct. at p. 769:

"The legislative history of the Act shows that it was lifted almost bodily from The Hague Rules of 1921, as amended by the Brussels Conference of 1924, 51 Stat. 233. The effort of those rules was to establish uniform bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade."

The French decision is Ste. Navale Caennaise v. Mrs. Gastin (S. S. ISEE). In that case, the shipper delivered four sealed containers to the S. S. ISEE which contained 275 parcels. Fifty-nine parcels were stolen from the containers while same were in the custody of the shipowner. The shipowner sought to limit liability by construing each container to be a package, but the trial court, Court of Appeals and the Supreme Court of France all held that the number of parcels, not containers, was the basis for computing the per package limitation.

I am aware defendants agreed to a flat charge of $1700 for each trailer regardless of the weight of the trailer. But it is apparent that this was a matter of convenience and in practice, plaintiff called for a CCT trailer only when it had a sufficient quantity of shrimp to be shipped.

My brother Mehrtens, J., in United Purveyors v. M/V New Yorker, 250 F. Supp. 102 (S.D.Fla.1965) held, as dicta, that a refrigerator trailer "constituted the unit upon which the freight charge was based." Accordingly, the $500 limitation under COGSA was found applicable to the entire shipment although the ultimate holding was that the carrier had not breached the contract of carriage and was therefore not liable.

The facts in *United Purveyors* can be distinguished from those involving IAF and CCT. In the cases sub judice, the shipper delivered master cartons to CCT, which were receipted for by the truck driver. In *United Purveyors*, there is no indication that the truck driver signed anything. In the cases at bar, the shipments were transported by CCT from Corinto to Managua, a distance of 75 miles, where CCT itself prepared the bills of lading based on the receipt signed by the driver. In *United Purveyors* the reverse appears to be true or at least no such similar facts appear.

CCT's published tariffs provided for a rate of $4.25 per hundred weight on shipments from Corinto to Miami, whereas in the *United Purveyors* case under the shipowner's " * * * printed tariff, the freight charge was computed solely with reference to the refrigerator trailer as a single unit, that is to say, that the trailer constituted the unit upon which the freight charge was based."

CCT's tariff does have trailer load rates on shipments similar to that in *United Purveyors*, but not from Corinto where $4.25 a hundred weight tariff prevails.

In short, the 65-pound, sealed and strapped master cartons which were delivered to CCT each constitute a COGSA "package" for transportation. The shipper did not deliver a sealed trailer to CCT but, on the contrary, CCT dispatched its trailer to receive the cargo for which its driver gave a receipt. Even if the shipper had delivered a sealed container to CCT, the definition of a package in the Brussels Protocol, clearly establishes that each unit within a container or pallet constitutes a package. The Supreme Court of France reached this conclusion without the need of the Brussels Protocol. The same result should follow here.

Having reached the above conclusion, it is unnecessary to deal with the alternative question of " * * * per customary freight unit," except as treated inferentially in this opinion or with the other bases under which the carrier might be held liable.